## IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:21-cr-39** |
| | ) | |
| **ABIGAYLE JANE FACHETTI** | ) | |

### MEMORANDUM OPINION RE:
### MOTION FILED AT ECF NO. 951

**Susan Paradise Baxter, United States District Judge**

On February 23, 2021, law enforcement officers executed a search warrant at the Harborcreek office of Hertel & Brown Physical and Aquatic Therapy ("HB"). While on the premises, officers interviewed various HB employees, including Abigayle MacDonald (now known as Abigayle Fachetti (hereafter, "Fachetti")). Having subsequently been indicted in this criminal action, Fachetti has filed a motion to suppress her statements. ECF No. 951. The defense and prosecution briefed the matter, and the Court held an evidentiary hearing on December 19, 2024.

At the evidentiary hearing, the Government presented testimony from Special Agents Brian Horvath and Brandon Lightner of the U.S. Department of Veteran Affairs Office of Inspector General ("DVA OIG"). The defense offered testimony from Julianne McCord, who was an HB employee at the time of the search and, like Fachetti, was interviewed by law enforcement agents. Both sides offered exhibits into evidence. The parties were also given an opportunity to file post-hearing briefs.

Having reviewed all relevant filings and evidence in the record, the Court will deny Fachetti's motion for the reasons that follow.

## I.    BACKGROUND

The Court begins with a review of the testimony received at the suppression hearing.

### A.  *Special Agent Horvath*

Special Agent Horvath ("Horvath") participated in the execution of the search warrant at HB's Harborcreek facility on February 23, 2021.  Hrg. Tr. (ECF No. 1057) at 5.  His role was to conduct a preliminary search to help "pull back" patients and staff within the office for safety reasons, and then assist in interviewing employees.  *Id*. at 5.

Horvath was among the law enforcement officers who initially entered the facility around 9:00 a.m. on the morning in question.  Tr. at 25. He was not given the names of the employees in advance, nor was he instructed to interview any particular individual. *Id*. at 5-6.  He testified that, prior to entering the facility, agents met down the street at a parking lot.  *Id*. at 6.  After a short briefing, they drove their vehicles over to the Harborcreek location and parked in front of the facility in single-file line.  *Id*. at 6-7.  Approximately ten agents from the FBI, Department of Health and Human Services, and DVA OIG entered the facility, all of them wearing clothing or gear that identified them as law enforcement.  *Id*. at 7, 9-10.  The facility was open for business, and the agents walked into the office through the front door without incident.  *Id*. at 7-8.  No officers had their guns drawn upon entry.  *Id*. at 8.

Once inside the building, agents conducted their preliminary search to clear the area for safety purposes.  Tr. at 8-9.  To that end, they explained that they were executing a federal search warrant and directed patients and employees to move to the front lobby/reception area of the office.  *Id*. at 9, 28.  According to Horvath, the officers used a civil, conversational tone.  Patients who needed to change their clothes were given plenty of time to do so and make their way to the front of the building.  *Id*. at 9.  Horvath did not physically remove anyone from their treatment

room. *Id*. at 10-11. He acknowledged that 8 employees were present at the time of the search, along with one additional person who was "shadowing." *Id*. at 27. He believed that he encountered between 3 to 6 patients on site. *Id*. at 10.

During this process, Horvath found the demeanor of the patients and employees to be calm. Most were surprised by the events, but Horvath did not observe any individual to be in distress. Tr. at 11. The agents were not shouting, raising their voices, or using vulgarity. *Id*. at 11. Although they carried firearms in their holsters, no agents drew their weapons or brandished them at any point. *Id*. at 11-12. Horvath estimated that it took less than 20 minutes to clear the area and assemble the patients and employees in the front of the building. *Id*. at 12. Patients were advised that their appointments were cancelled for the day. *Id*. at 27.

After the premises was secured, Agents Horvath and Lightner prepared to interview HB employees. Tr. at 12. At some point, they encountered Ms. Fachetti (then MacDonald), whom they questioned for approximately one hour. *Id*. at 13, 20. The interview occurred in a treatment room, with Horvath seated in a chair near the door and Lightner seated to the left of Horvath. *Id*. at 13-14, 41. Ms. Fachetti was seated across the room, approximately five feet from the agents. *Id*. at 14, 18. The door was closed for privacy reasons but was not blocked. *Id*. at 15-16.

Horvath testified that, at the commencement of the interview, the agents presented their credentials and explained their role in investigating fraud, waste, and abuse within the VA's programs. Tr. 14. After obtaining Ms. Fachetti's identifying and contact information, Horvath explained that the interview was voluntary and that, if there were questions Fachetti wanted to answer, she could feel free to answer them. *Id*. at 15. Horvath indicated that they would "start off with basics," discussing her educational background and work history, and if there were

questions that she did not want to answer, "the door might be closed because of privacy, but it's free to open; you can walkout if you want to." *Id*. at 15; *see also id*. at 47.

Horvath described Ms. Fachetti's demeanor as calm, talkative, friendly, and at ease. Tr. at 16. He testified that she was "quite helpful" during the interview and never expressed unwillingness or hesitancy in answering the agents' questions. *Id*. at 16-17. He characterized their discussion as "information gathering" in a conversational tone. *Id*. at 17, 22. According to Horvath, the agents never acted in a confrontational manner toward Ms. Fachetti. *Id*. at 17. They did not stand over her, intimidate her, or handcuff her. *Id*. There was no physical contact between the agents and Ms. Fachetti. *Id*. The agents never called her a liar or expressed disbelief in what she was saying. *Id*. at 18. They never used vulgarity, or spoke in a hostile manner, or remarked that she would be charged with a crime or indicted. *Id*. at 18, 22. During the interview, Ms. Fachetti never asked to take a break, nor did she attempt to invoke her rights or request a lawyer. *Id*. at 17.

Ms. Fachetti exited the exam room at the conclusion of her interview, as she was not placed under arrest. Tr. at 21. Horvath was not personally aware of anyone preventing employees or patients from leaving the premises whenever they wanted to. *Id*. at 22. The front door was not locked to his knowledge, but the entrance was secured so that no one could enter the facility while the search was going on. *Id*. at 29. Patients who were scheduled to come in that day were called off, and someone placed a note on the front door advising that appointments had been cancelled for the day. *Id*. at 29.

### B. *Special Agent Lightner*

Special Agent Lightner was also present to assist with the search of HB's Harborcreek facility. Tr. at 51. Like Horvath, Lightner assisted with the preliminary sweep of the office and

the interviewing of employees. *Id*. at 52. He was not given a list of designated interviewees in advance. *Id*. at 52-53.

Lightner was the third or fourth agent to enter the business at around 9:00 a.m. Tr. at 53. He wore a tactical vest with a "police" marking. *Id*. at 55. He recalled the lead agent informing the front desk receptionist that the agents had a federal search warrant, that the business would have to shut down for the day, and that they needed people to gather their things and move to the front of the office. *Id*. at 53, 68. This discussion occurred in a "conversational tone." *Id*. at 54.

Lightner then proceeded to check the pool area and helped "corral[]" people to the front of the facility for officer safety. Tr. at 54. According to Lightner, this took about 10 or 15 minutes. *Id*. at 55. During this time, the officers did not have their guns drawn or visible, and they were not yelling or screaming. *Id*. at 54. Instead, they just asked individuals to "please move to the front" of the building and explained that they had a warrant to be there. *Id*. The agents' tone was friendly and conversational, and they encountered no hostility. *Id*. at 54-55. The employees and patients were "pretty pleasant," and no one appeared to be upset or distressed. *Id*. at 55.

After the initial clearance process was complete, Horvath and Lightner prepared to interview employees. Tr. at 55-56. They found an empty exam room, ensured it was safe, and then began talking to individuals. *Id*. at 56. At approximately 10:15 a.m., they interviewed Ms. Fachetti. *Id*. at 72. Horvath asked questions based on an interview outline that had been provided to the agents; Lightner took notes and later compiled a memorandum report of the interview. *Id.* at 71-74; *see also* Defense Exhibits C, D and H.

Upon initially meeting Ms. Fachetti, the agents introduced themselves and took her to the exam room. Tr. at 57. Lightner recalled that he sat to the left of Horvath, who was seated near

the doorway, with Ms. Fachetti sitting on a treatment table a few feet across from Lightner. *Id.* at 58-60, 73. According to Lightner, Special Agent Horvath "explained to [Ms. Fachetti] that the door was shut, but not locked, . . . just for privacy purposes; . . . she could leave at any time, and . . . it was a voluntary interview." *Id.* at 57-58. Horvath made this statement "as soon as [the agents] walked into the room and the door was shut." *Id.* at 74. Lightner testified that he did not immediately record his note about the voluntariness of the interview because he was "trying to keep up" with Horvath. *Id.*

Lightner described Ms. Fachetti's demeanor during the interview as "very calm and pleasant" and "very helpful. Like, wanting to help." Tr. at 58. He testified that the agents were likewise "[c]alm and collected" and "appreciated her information." *Id.* According to Lightner, the interview never became hostile or confrontational. *Id.* at 58-59. No threatening or intimidating conduct occurred. *Id.* at 60. The agents never drew their guns, or applied handcuffs or made physical contact with Ms. Fachetti. *Id.* at 61. They never questioned her truthfulness or indicated that she would be charged or indicted. *Id.* at 62. The agents never asked for her phone or took possession of it. *Id.* at 62. They did not attempt to restrict her movement in any way. *Id.* at 63-64.

Lightner testified that, during the interview, Ms. Fachetti never hesitated or appeared as if she did not want to answer questions. Tr. at 59. She did not cry or become emotional. *Id.* at 63. She never asked for food or water, nor did she request a break. *Id.* At one point, according to Lightner, Fachetti removed a laminated sheet containing billing codes from the wall behind him and produced it to the agents. *Id.* at 59-60. After the hour-long interview, Ms. Fachetti left the exam room. *Id.* at 62-63. She was not arrested, nor was she instructed to wait in the lobby or admonished not to talk to others. *Id.* at 63.

*C.  Julianne McCord*

Ms. McCord was employed as the front office manager at HB's Harborcreek facility on February 23, 2021 and was present during the agents' search. Tr. at 78-79. She recalled seeing 10 to 12 agents enter the building that morning and announce that they were with the FBI and that they had a search warrant. *Id*. at 80-82. There were patients on the premises at that time, and FBI agents escorted them out of the building. *Id*. at 82. At some point, Ms. McCord phoned other patients who were scheduled to come in that day and informed them that their appointments were being cancelled. *Id*. As she did this, FBI agents stood "right behind" her and watched. *Id*. at 82-83.

Ms. McCord testified that the HB employees were required by agents to put their personal cell phones together in one spot. Tr. at 83. All the employees, including Ms. Fachetti and Ms. McCord, were gathered together in the "gym area" of the office. *Id*. at 84-85. Ms. McCord recalled FBI agents telling the group "you can't leave until we speak to you." *Id*. at 84. They were not permitted to use their cell phones while they waited. *Id*. at 83-85. According to Ms. McCord, the only non-patient who left the premises prior to questioning was a student who was shadowing for the day. *Id*. at 84. Ms. McCord did not see any employee leave immediately after they were interviewed. *Id*. at 85.

Ms. McCord testified that she waited for approximately 60 to 90 minutes before being taken to a treatment room. Tr. at 85-86. There, she was questioned by two agents for approximately 30 minutes. *Id*. at 86-87. During the interview, Ms. McCord sat on the exam table, while the agents sat on a stool and a chair. *Id*. She recalled that the door to the exam room was closed, and she did not feel like she was free to leave the interview. *Id*. at 87-88.

After her interview, Ms. McCord was photographed.  Tr. at 88; *see also* Defense Ex. N. According to Ms. McCord, FBI agents advised employees that they needed to get the employees' pictures before they left the premises.  *Id*. at 89.  Ms. McCord stated that she did not feel like she could refuse being photographed.  *Id*.  She stated that all HB employees were similarly photographed before they left.  *Id*.

On cross-examination, Ms. McCord acknowledged that the agents announced their presence in a conversational tone without screaming. Tr. at 90.  They were polite when interacting with her and the other employees and patients.  *Id*. at 90, 92.  The agents allowed the patients on site to gather their belongings and helped them exit the facility.  *Id*.  When the agents requested HB employees to call patients and notify them of their appointments being cancelled, this was done as a matter of convenience to those individuals, who would otherwise have wasted their time coming to the office that day.  *Id*. at 90.  Ms. McCord did not consider anything about that process to be coercive.  *Id*. at 90-91.

Ms. McCord testified that no agent placed handcuffs on her that day, nor did they tell her that she was under arrest or that she would be arrested.  Tr. at 91.  The interviewing agents did not threaten her or anyone else.  *Id*.  Ms. McCord did not recall whether the interviewing agents told her that the interview was voluntary and could be stopped at any time, but she conceded it was possible they did so.  *Id*. at 91, 94.  She acknowledged that no one used vulgarity toward her or her coworkers.  *Id*. at 92.  Nobody spoke of either her or the business itself being indicted.  *Id*. No agent placed hands on her, nor did she see any agents make physical contact with the other employees.  *Id*. at 92.  After a couple hours or so, she and the other employees left the premises. *Id*. at 91-94.  No one stood at the door preventing her from leaving.  *Id*. at 93.  However, no one informed her at any point that she was free to leave.  *Id*. at 91.

D.  *Credibility Determination*

On a motion to suppress evidence, the trial court is the finder of fact and must determine the credibility of witnesses, weigh the evidence, and reach "any inferences, deductions and conclusions to be drawn from the evidence." *United States v. Cole*, 425 F. Supp. 3d 468, 473 (W.D. Pa. 2019).  As the finder of fact, the Court "is free to accept or reject any or all of a witness's testimony." *United States v. Murphy*, 402 F. Supp. 2d 561, 569 (W.D. Pa. 2005) (citation omitted).  The Court makes its credibility determinations by considering "numerous factors, including the witness's demeanor and manner while on the stand, the witness's ability to accurately recollect the matters at hand, the manner in which the witness may be affected by the outcome, the extent to which the witness's testimony is either supported or contradicted by other evidence and testimony in the case, and, ultimately, the extent to which it withstands a common sense test of reason and logic." *Id*.  A witness' testimony is not to be judged more or less credible because the witness is a law enforcement officer.  *Id*. at 569-70 (citations omitted).

Based on the foregoing factors, the Court finds that all of the witnesses who testified at the hearing were generally credible.  Each gave a fairly detailed account of his or her observations and demonstrated good recall of the events in question.  Both the prosecution and the defense witnesses agreed on the general timeline of events and the manner in which the agents on site conducted themselves.  The accounts given by Special Agents Horvath and Lightner were generally consistent and mutually corroborative.  The Court also does not perceive any major factual conflicts between Ms. McCord's testimony and that of the agents.  This is largely because, at various points in time during the day, the witnesses were in different areas of the facility observing different things.

Importantly, the Court credits Special Agent Horvath's and Lightner's testimony that Ms. Fachetti was advised of the voluntary nature of her interview. On this point, the agents testified unequivocally and were consistent with one another. Although the voluntariness of the interview is not referenced in Special Agent Lightner's memorandum report of the interview, that report expressly acknowledges that it "is not intended to be a verbatim account and does not memorialize all statements made during the interview." Gov't Ex. 1; Defense Ex. D. Moreover, the agents' testimony is corroborated by Special Agent Lightner's contemporaneous interview notes, which include the phrase "explained it was voluntary interview" immediately below Ms. Fachetti's identifying and contact information. *See* Gov't Ex. 2; Defense Ex. H. When asked if she too had been told that her interview was voluntary and could be stopped at any time, Ms. McCord initially stated that she could not recall; however, she later conceded that she may have been so advised. In any case, nothing about Ms. McCord's testimony provides a basis for discrediting the agents' testimony concerning what they told Ms. Fachetti. Therefore, the Court finds that Special Agent Horvath expressly advised Ms. Fachetti that her interview was voluntary and that she could stop it or leave the room at any time.

The Court also credits Ms. McCord's testimony that agents photographed and interviewed all HB employees on site during the search process. The Court further credits Ms. McCord's testimony that, after the employees were initially assembled in the "gym area" of the office, agents informed the group, "[Y]ou can't leave until we speak to you." Tr. at 84. Additionally, the Court credits Ms. McCord's testimony that employees' cell phones were gathered into a common area and were temporarily inaccessible to them while the officers conducted their search. By the same token, the testimony from all witnesses establishes that the agents were polite and conversational toward those whom they encountered.

## II.    GOVERNING LEGAL STANDARDS

The Fifth Amendment to the U.S. Constitution protects against compelled self-incrimination.  U.S. Const. amend V.  To effectuate this protection, the Supreme Court held in *Miranda v. Arizona*, 384 U.S. 436 (1966), that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444.  Because a custodial interrogation involves "inherently compelling pressures," *id*. at 467, a defendant who "has been taken into custody or otherwise deprived of his freedom of action in any significant way" must be given the warnings prescribed in *Miranda*, including the right to remain silent and the right to counsel. *Id*. at 444, 468-70.

"As a general rule, the burden of proof is on the defendant who seeks to suppress evidence." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995).  However, Ms. Fachetti has satisfied her initial burden by alleging she was subjected to custodial questioning without the benefit of *Miranda* warnings.  *United States v. Hvizdzak*, No. CR 21-30E, 2024 WL 4150099, at *6 (W.D. Pa. Sept. 11, 2024).  Factually, there is no dispute that *Miranda* warnings were not administered in connection with her questioning.  Accordingly, in the context of this case, the Government bears the burden of proving by a preponderance of the evidence that there was no custodial interrogation implicating *Miranda*.  *Id*.

"To determine whether an individual was in custody, we first establish the circumstances surrounding the interrogation." *United States v. Ludwikowski*, 944 F.3d 123, 131 (3d Cir. 2019) (cleaned up).  Next, "we ask, as an objective matter, whether a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave." *Id*.  In other words, the

Court must consider whether there was a "restraint on freedom of movement of the degree associated with a formal arrest." *Id*.

However, this "freedom-of-movement test" identifies only a necessary and not a sufficient condition for *Miranda* custody. *Id*. Courts must therefore ask the "additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id*.

Even where there has been no *Miranda* violation, the Court still must determine whether the defendant's statements were voluntary. *See United States v. Swint*, 15 F.3d 286, 288-89 (3d Cir. 1994) (treating custody and voluntariness as separate inquiries). In "special circumstances," a confession might be involuntary even if the person giving it is not in custody. *Ludwikowski*, 944 F.3d at 135.

A statement is involuntary when the suspect's "will was overborne in such a way as to render his confession the product of coercion." *Arizona v. Fulminante*, 499 U.S. 279, 288 (1991). Whether a statement is voluntarily made is determined from "the totality of all the surrounding circumstances - both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).

The prosecution has the burden of establishing, by a preponderance of the evidence, that a challenged statement was voluntary -- that is to say, that is, "the product of an essentially free and unconstrained choice." *Ludwikowski*, 944 F.3d at 135 (citation omitted). In making this determination, courts consider the officers' tactics, including "the length of detention; the repeated and prolonged nature of questioning; and the use of physical punishment such as the deprivation of food or sleep." *Halsey v. Pfeiffer*, 750 F.3d 273, 303 (3d Cir. 2014) (quoting *Miller v. Fenton*, 796 F.2d 598, 604 (3d Cir. 1986)). Courts also consider the defendant's

characteristics, such as youth, lack of education or low intelligence, lack of advice concerning

his/her constitutional rights, and background/experience, including prior dealings with the

criminal justice system. *Ludwikowski*, 944 F.3d at 135. All these factors assist in answering the

"ultimate question" -- namely, "whether the defendant's will was overborne when he confessed."

*Id.* (cleaned up); *see Miller*, 796 F.2d at 605 (The overriding question in evaluating voluntariness

is whether the law enforcement officer's tactics and statements "were so manipulative or coercive

that they deprived [the defendant] of his ability to make an unconstrained, autonomous decision

to confess.").

### III.    ANALYSIS

#### A.  *The Circumstances of Fachetti's Interview*

As outlined above, approximately ten law enforcement agents entered HB's Harborcreek

facility on the morning of February 23, 2021 to execute the search warrant. Several police

vehicles were parked in a single-file line near the front of the facility, though not blocking the

entrance. The agents who entered the premises wore clothing or equipment identifying them as

law enforcement, and they were fully armed, although no weapons were ever drawn or

brandished in connection with the search.

As the officers entered the facility, the lead agent explained their presence and the fact

that they had a search warrant for the facility. Officers began directing patients and employees

to the front area of the office in an attempt to clear the area for officer safety. This process took

10 to 20 minutes. During this time, officers addressed patients and employees in a polite tone,

without shouting or using vulgarity. Patients were allowed to collect their belongings, and were

assisted out of the building, while HB employees were asked to deposit their phones in a

collective location. Employees were advised that they needed to remain on site until agents had

a chance to speak with them.  Agents never arrested any employees or had physical contact with

them.  At some point, Ms. McCord (and possibly other HB employees) called patients to cancel

their appointments for the day, while agents observed.  The front door was neither locked nor

blocked, but an agent was present to ensure that no one entered the facility while officers

conducted their search.

While the agents were on the premises, all employees were interviewed and had their

photos taken.  As the search was ongoing, Special Agents Horvath and Lightner assisted in

conducting employee interviews.  All employees departed the building after approximately two

hours or so.

### B.  The Defendant Was Not in Custody at the Time She Gave Her Statements to the Interviewing Agents

Having discussed the general circumstances under which Ms. Fachetti was questioned,

the Court considers whether a reasonable person in the same circumstances would have felt free

to leave.  The Court's analysis depends on numerous factors such as:

> the interview's location, physical surroundings, and duration; whether [the interviewee] voluntarily participated; whether he was physically restrained; whether other coercive tactics were used, such as hostile tones of voice or the display of weapons; and whether the interviewee was released when the questioning was over. *Id.; United States v. Willaman*, 437 F.3d 354, 359-60 (3d Cir. 2006). We also consider whether the questioner believed the interviewee was guilty; whether the interviewee was specifically told he was not under arrest; and whether he agreed to meet knowing that he would be questioned about a criminal offense. *Jacobs*, 431 F.3d at 105-06.

*Ludwikowski*, 944 F.3d at 132.

Here, the interview occurred at Ms. Fachetti's place of employment, which was a setting

familiar to her.  Though there were numerous agents on site, Ms. Fachetti was not completely

isolated, as many of her fellow employees were also present on site.  Even when she was alone in

the interview room with two agents, she knew that other fellow employees were nearby.  The

interview room itself was relatively small and the door was closed for privacy, but the door was

never locked or physically blocked, nor was Ms. Fachetti physically restrained in any way.

Despite the small space, Ms. Fachetti was able to move about and, at one point, she got up to

retrieve a laminated chart from the wall, located behind Special Agent Lightner.

At the outset of the interview or immediately after giving her identifying and contact

information, Ms. Fachetti was told that the interview was voluntary and, if there were questions

that she wanted to answer, she could do so.  Ms. Fachetti was also expressly advised that, despite

the door being closed for privacy, she could terminate the interview and leave the room at any

point if she wanted.  Having been so advised, Ms. Fachetti nevertheless agreed to answer the

agents' questions.  Given that the officers were on the premises for the purpose of executing a

federal search warrant, a reasonable person in Ms. Fachetti's position could surmise that the

officers were investigating suspected illegal activity.  Furthermore, Special Agent Horvath had

explained, prior to questioning Ms. Fachetti, that he and Special Agent Lightner were involved in

investigating fraud, waste, and abuse within the VA's programs.

Ms. Fachetti's interview commenced at 10:15 a.m., approximately 75 minutes after the

agents had first entered the building.  *See* Gov't Exhibits 1 and 2; Defense Exhibits B, D, and H.

The interview lasted approximately one hour and two minutes (until 10:17 a.m.), with Special

Agent Horvath conducting the questioning and Special Agent Lightner taking notes.  *See id.*

During this time, the agents did not use hostile tones, vulgarity, or other coercive tactics.

Instead, their tone was conversational.  The agents never displayed their weapons to Fachetti.

They did not state or imply that they believed she was guilty or that she was lying.  The

interviewers also did not state or imply that criminal charges were forthcoming against Fachetti

or against HB; in fact, the agents were not given the names of specific employees to interview

ahead of time.  At no point in time was Fachetti placed under arrest or told that she would be

arrested.  At the conclusion of her interview, she left the room freely and, soon thereafter, she

left the premises altogether, along with her fellow employees.[1]

Based on a consideration of the factors outlined above, the Court finds that a reasonable

person in Ms. Fachetti's position would have felt free to terminate the interview and leave.  The

agents therefore did not effectuate "a restraint on Fachetti's freedom of movement of a degree

associated with a formal arrest." *Ludwikowski*, 944 F.3d at 131. The Court also finds that the

environment of the interview did not "present[ ] the same inherently coercive pressures as the

type of station house questioning at issue in *Miranda*." *Id*.  Consequently, the Government has

satisfied its burden of proving that no custodial interrogation occurred and, therefore, *Miranda*

warnings were not required.

In rendering these findings, the Court recognizes Ms. McCord's testimony that she did

not personally feel free to terminate her own interview or refuse to be photographed by the

agents.  But Ms. McCord's subjective views are ultimately irrelevant insofar as the Court's

assessment of whether the Defendant was in "custody" involves an objective standard -- i.e.,

"whether a reasonable person would have felt that he or she was not at liberty to terminate the

interrogation and leave." *Ludwikowski*, 944 F.3d at 131; *see also United States v. Woodson*, 30

F.4th 1295, 1304 (11th Cir. 2022) ("Because the custody test is objective, we do not consider

subjective beliefs -- even those of others who are interrogated.").  Here, the Court finds that a

---

[1] Ms. McCord testified that the employees left the premises together about two hours after the
agents first arrived. *See* Hrg. Tr. at 94. The record shows that the agents arrived around 9:00
a.m., *see* Defense Ex. B, so Ms. McCord's testimony would suggest that all employees left the
premises around 11:00 a.m.  Because the evidence shows that Ms. Fachetti's interview was
concluded at 11:17 a.m., *see* Gov't Ex. 1 and 2, and Defense Exs. D and H, the Court infers, and
finds as a matter of fact, that all employees departed the office together shortly after Ms. Fachetti
was interviewed and photographed.

reasonable person subjected to the same circumstances as Ms. Fachetti would understand that they could leave the exam room and terminate the interview.

The Court's findings in this regard are not altered by the fact that employees were temporarily separated from their phones, photographed, and informed that they would have to stay until an agent spoke to them. The restriction on cellphone usage suggest that the agents were trying to protect the integrity of the investigation by preventing employees from communicating with one another during the search and interview process. This minimal and temporary restriction is unlike the situation in *United States v. Warsame*, cited by the defense. In *Warsame*, the defendant was taken to a "nearly unoccupied" military base, where he was kept overnight and repeatedly questioned over a two-day period. *See* 488 F. Supp. 2d 846, 860 (D. Minn. 2007). The "police domination" was found to be "pervasive" under circumstances where the defendant was not told the name of the city he was in, he could use the phone only with permission, the phones bore signs indicating that conversations would be recorded, the defendant was chaperoned at all times, and there was a continuous presence of agents over the two-day period. No such oppressive circumstances existed in Ms. Fachetti's case.

In arguing that Ms. Fachetti was subjected to a police-dominated atmosphere, the defense emphasizes that HB employees were informed by FBI agents they would have to stay on site "until we speak to you." Tr. at 84. The Court finds, however, that these circumstances -- whether considered alone or as part of the totality of circumstances -- are insufficient to transform Ms. Fachetti's interview into a "custodial" interrogation. Although Ms. McCord formed the subjective impression that she had to stay at the facility until she was questioned, she did not recall being expressly told that she could not leave. *Id.* at 83. Moreover, being "spoken to" by agents does not necessarily imply that an employee is required to speak back or submit to

an involuntary interrogation. Regardless, as the Government correctly observes, the focus must be on what occurs during the interview itself. *See United States v. Woodson,* 30 F. 4th 1295, 1305-06 (11th Cir. 2022) ("To be sure, we sometimes consider the circumstances that led up to questioning in assessing whether an individual was exposed to a serious danger of coercion. . . . But the emphasis is rightly placed on the environment surrounding the interview itself. For this reason, neither the fact that Woodson was restrained before the interview nor the high number of officers involved in the search—yet uninvolved in questioning Woodson—rendered the interview custodial.") (internal citation omitted); *United States v. Wallace*, 323 F.3d 1109, 1113 (8th Cir. 2003) (court recognizing that, in determining whether an individual is in custody, "[o]ur main focus must be on the individual's restraint during the interview."). Here, unlike in *United States v. Hazelwood*, another case relied upon by the defense, Ms. Fachetti was expressly told that her participation was voluntary and that she could terminate the interview and leave the room at any time. *Cf. Hazelwood*, No. 1:10 CR 150, 2011 WL 2553265, at *19 (N.D. Ohio June 28, 2011) (suppression hearing was warranted where defendant alleged, among other things, that he was isolated from others during his interview and "was not allowed to leave the room, never told he did not have to talk, and never told he was free to leave").

Nor are the facts of this case analogous to those presented in *Missouri v. Seibert*, 542 U.S. 600 (2004), a third case upon which Ms. Fachetti relies. In *Seibert,* there was no dispute that the defendant had been subjected to a custodial interrogation at the police station; instead, the question was whether the officer's administration of *Miranda* warnings was constitutionally sufficient. Relevantly*,* the officer had interrogated the defendant for 30 to 40 minutes and extracted a confession prior to taking a break, *Mirandizing* her, and then recommencing the interrogation. The officer acknowledged that he had purposefully utilized this technique in an

attempt to use the initial confession to extract the same incriminating information after eventually *Mirandizing* the defendant. The Supreme Court ruled that "[b]ecause this midstream recitation of warning after interrogation and unwarned confession could not effectively comply with *Miranda's* constitutional requirement, . . . a statement repeated after a warning in such circumstances is inadmissible." 542 U.S. at 604. Here, no such unconstitutional conduct occurred. Instead, the credible testimony establishes that Ms. Fachetti was advised of the voluntary nature of her interview either immediately at the outset of the interview or, at the latest, immediately after the agents recorded her identifying information and contact information. Under either scenario, Ms. Fachetti was advised of the voluntary nature of her interview prior to answering any substantive questions about the investigation and well before she gave any incriminating information. The Court finds that the agents' conduct was constitutionally sufficient under the circumstances.

For all of these reasons, the Court concludes that Ms. Fachetti was not in "custody," for Fifth Amendment purposes, when she was interviewed by Special Agents Horvath and Lightner.

### C. The Defendant's Statements to the Agents were Given Voluntarily

The Government also has the burden to prove, by a preponderance of the evidence, that the Defendant's statements were voluntary—that is, "the product of an essentially free and unconstrained choice." *Ludwikowski*, 944 F.3d at 135 (citation omitted). In making this determination, courts consider the officers' tactics, including "the length of detention; the repeated and prolonged nature of questioning; and the use of physical punishment such as the deprivation of food or sleep." *Halsey v. Pfeiffer*, 750 F.3d 273, 303 (3d Cir. 2014) (quoting *Miller v. Fenton,* 796 F.2d 598, 604 (3d Cir. 1986)). Courts also consider the defendant's characteristics, such as youth, lack of education or low intelligence, lack of advice concerning

his/her constitutional rights, and background/experience, including prior dealings with the criminal justice system. *Ludwikowski*, 944 F.3d at 135. All these factors assist in answering the "ultimate question" -- namely, "whether the defendant's will was overborne when he confessed." *Id*. (cleaned up); *see Miller*, 796 F.2d at 605 (The overriding question in evaluating voluntariness is whether the law enforcement officer's tactics and statements "were so manipulative or coercive that they deprived [the defendant] of his ability to make an unconstrained, autonomous decision to confess.").

In this case, Ms. Fachetti is an educated adult who was employed in a professional capacity at the time of her interview. As discussed, the agents began questioning Ms. Fachetti approximately 75 minutes after they first arrived. Their interview lasted for one hour and two minutes. Thus, the process did not involve an unusually lengthy detention, prolonged questioning, physical punishment, or other coercive tactics as a means of obtaining information. Moreover, Ms. Fachetti was advised that the interview process was voluntary and that she could leave the room if she chose. The agents testified credibly that Ms. Fachetti was cooperative throughout her interview and did not appear distressed. She never requested a break, never asked for food or water, and never invoked her legal rights. Although it is unclear whether Ms. Fachetti had prior dealings with the criminal justice system or was fully aware of her constitutional rights, there is nothing in the record to suggest that her age, educational background, intelligence, physical condition, or mental status in any way limited her ability to make an unconstrained and autonomous decision to speak with the agents. On the contrary, the preponderance of credible evidence establishes that Ms. Fachetti's will was not overborne when she made statements to the investigating agents.

## IV.    CONCLUSION

Based upon the foregoing analysis, which constitutes the Court's findings of fact and conclusions of law, the Court finds that the Government has met its burden of proving, by a preponderance of evidence, that Ms. Fachetti was not in custody when she was interviewed by agents on February 23, 2021.  As a result, no Fifth Amendment violation occurred by virtue of the agents' failure to administer *Miranda* warnings.  The Government has also sustained its burden of proving, by a preponderance of evidence, that Ms. Fachetti's statements were given voluntarily.  Accordingly, the Defendant's motion to suppress will be denied.

An appropriate order follows.


SUSAN PARADISE BAXTER
United States District Judge